UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**MONTANA TUNNELS MINING, INC.,**<br><br>Debtor. | Case No. **2:22-bk-20132-BPH** |

# MEMORANDUM OF DECISION

## I.  Introduction

In this chapter 11 bankruptcy,[1] Debtor failed to make payments required under its confirmed plan. These payments were a prerequisite for triggering the plan's effective date. The confirmed plan explicitly provides that if the effective date is not achieved, the case will be dismissed. Instead of dismissing the case, creditors and the United States Trustee ("the UST") request the case be converted to chapter 7, despite the confirmed plan explicitly stating dismissal is the remedy if the effective date is not achieved. For the reasons stated below, Debtor's case is dismissed.

## II.  Procedural Background

The UST filed a "Motion to Dismiss or Convert," stating that cause exists for dismissal or conversion of Debtor's chapter 11 case pursuant to § 1112(b) because Debtor had materially default under its confirmed plan,[2] failed to file monthly operating reports, and failed to pay the full amount of quarterly fees owed to the UST.[3] The Montana Department of Environmental Quality ("the DEQ") filed a Joinder to the Motion.[4] Debtor initially filed an Objection to the Motion,[5] but subsequently filed a Consent to the Motion, agreeing to dismissal.[6]

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Third Amended Plan, ECF No. 102 ("Plan").

[3] ECF No. 114 ("Motion").

[4] ECF No. 117 ("Joinder").

[5] ECF No. 118 ("Debtor's Objection").

[6] ECF No. 123. Debtor has since filed a Motion to Dismiss at ECF No. 144. ("Debtor's Motion to Dismiss").

1

On the eve of the April 10, 2024, hearing on the Motion, the DEQ filed a "Joint Motion to Convert Hearing to Status Conference" indicating that a prospective buyer, the Mooney Group, had been identified who was interested in the purchase of Debtor's assets.[7] The Court construed the "Joint" modifier in the Joint Motion event to indicate that Debtor, the DEQ, and other parties had engaged in discussions prior to the hearing regarding an alternative to dismissal, including the potential liquidation of Debtor's assets and granted the Joint Motion.[8]

At the April 10th Status Conference, it became clear that the Court was mistaken in this respect and the UST indicated he had not agreed to the conversion of the hearing on the Motion to a status conference. However, the UST consented to additional time to allow the parties to determine if an alternative path forward was viable. The Court continued the status conference.[9]

In the interim, Creditor LD Construction, Inc. ("LD Construction") additionally filed a Motion to Convert.[10] Debtor objected.[11] Believing the UST and Debtor both wished to dismiss the case, the Court set LD Construction's Motion for the same day as April 26th Status Conference, stating that it was not inclined to delay a determination on dismissal any further.[12]

At the April 26th Status Conference, the UST informed the Court its preferred alternative was conversion, not dismissal. Recognizing that the UST, the DEQ, and LD Construction preferred conversion while Debtor requested dismissal, the Court set a final hearing date on June 5, 2024, so that the parties could present evidence and witnesses testimony as to their respective positions.[13]

At the hearing, the DEQ's exhibits 1-12 and Debtor's exhibits A and B were admitted. Dan Walsh ("Walsh"), the DEQ's Mining Bureau Chief, Patrick Imeson ("Imeson"), Chief Executive Officer of Debtor, and James Mooney ("Mooney"), representative of prospective buyer the Mooney Group, provided testimony. This Court found the testimony of each witness to be credible. The parties further staked out their respective positions. The UST, the DEQ and LD Construction argued that the plain language of § 1112(b) controls and the best interests of creditors weighed in favor of conversion. Debtor and Black Diamond Acquisition Partners, Black Diamond Holdings LLC, Elkhorn Goldfields, Inc., Goldfields Funding Partners, LLC, Imeson, and Montana Goldfields Inc. (collectively, "Insiders") argued that the clear language of Debtor's Plan and the best interests of creditors demanded dismissal.

---

[7] ECF No. 124 ("Joint Motion").

[8] ECF No. 125. The status conference was held April 10, 2024 ("April 10th Status Conference").

[9] ECF No. 130. The Court set the continued status conference for April 26, 2024 ("April 26th Status Conference").

[10] ECF No. 126 ("LD Construction's Motion").

[11] ECF No. 132.

[12] ECF No. 133.

[13] ECF No. 142.

### III. Factual Background

#### A. Pre-petition events

Debtor was formed in 1998 to own and operate the Montana Tunnels gold-zinc-silver-lead open pit mining operation (the "Montana Tunnels Mine").[14] The Montana Tunnels Mine began operation in 1987.[15] Debtor is the owner of the Montana Tunnel Mine and a concentration facility.[16] Debtor is a subsidiary of Montana Goldfields, Inc ("Goldfields").[17] Goldfields is a subsidiary of Black Diamond Holdings, LLC.[18] Goldfields became a non-operating owner of the Montana Tunnels Mine in 2006 and Debtor became a full owner of the Montana Tunnels Mine in 2010.[19]

Debtor's business operations were a combination of Debtor's disturbed surface reclamation activities, its efforts through Goldfields to raise capital sufficient to provide the required bonding to commence development of the M-Pit of the existing Montana Tunnels Mine, and the reopening of its concentration facility to provide milling services to affiliate Elkhorn Mine.[20] Debtor has not engaged in mining or operated the concentrator since 2009.[21] Instead, testimony indicated that its activities have been limited to reclamation work, and other tasks intended to maintain the facility, such as pumping water between retaining ponds and turning the mills so that they do not rest on their bearings.

The DEQ administers the Metal Mine Reclamation Act ("MMRA").[22] The MMRA establishes reclamation and bonding requirements and standards for lands disturbed by hard rock mining in Montana.[23] Any entity engaged in hard rock mining, like Debtor, must obtain a permit from the DEQ.[24]

---

[14] Debtor's Seconded Amended Disclosure Statement at ECF No. 76 at p. 12.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at p. 10.

[20] *Id.* at pp. 11-12.

[21] DEQ's Conditional Consent to Debtor's Motion to Extend Exclusivity Period, ECF No. 37 at p. 3.

[22]*Id.* at p. 1.

[23] *Id.* at p. 2.

[24] *Id.*

3

Under the MMRA, reclamation activities must be completed within two years of the abandonment of a mining operation, unless a longer period is approved by the DEQ.[25] To facilitate this, each mining operator permit holder must supply the DEQ with bonds for any land disturbed by mining operations.[26] A failure to supply these bonds results in the suspension of the operator's mining permit.[27] The operator is not allowed to resume mining until the required bond is posted.[28] The DEQ is required to conduct a comprehensive review of each bond submitted under the MMRA at least every five years.[29]

The DEQ notified Debtor of its most recent bond determination in 2018.[30] Debtor was underbonded, and its mining permit was suspended by operation of law.[31] In September of 2022, Debtor entered into an Amended Administrative Order on Consent ("AOC") with the DEQ to address its noncompliance with the MMRA.[32] Debtor had through March 27, 2023, to satisfy the conditions of the AOC, including posting the required cash bonds and make progress on reclamation.[33] Debtor failed to do so.[34] A week after missing its second bond payment under the AOC, it filed bankruptcy.[35]

### B. Post Petition Events

Debtor filed bankruptcy on December 5, 2022. Ten creditors filed proofs of claim.[36] Of these ten claims, six are government entities.[37] The remaining creditors are non-government

---

[25] *Id.*

[26] *Id.*

[27] *Id.* at p. 3.

[28] *Id.*

[29] DEQ Ex. 2, Forfeiture Notice at p. 2.

[30] *Id.*

[31] *Id.*

[32] *Id.* at p. 3.

[33] *Id.* at pp. 3-4.

[34] *Id.* at p. 4.

[35] *Id.*

[36] See Claims Register.

[37] Internal Revenue Service, Claim No. 1-2; Montana Department of Labor, Claim No. 3-1; Bureau of Land Management, Claim No. 7-1; United States Environmental Protection Agency, Claim No. 8-1; Montana Natural Resource Damage Program, Claim No. 9-1; DEQ, Claim No. 10-1.

entities.[38] Debtor has additionally scheduled the claims of Goldfields, Gordon Snyder, Jefferson County Treasurer's Office, Black Diamond Acquisition Partners, Black Diamond Holdings, LLC, Crowley Fleck PLLP, Elkhorn Goldfields, Inc., Lloyd Mining Services, PLLC, and Imeson.[39] Claims by government units account for the majority of all filed or scheduled claims.[40] Of all creditors, only the DEQ and LD Construction have staked out a position on the Motion.

Debtor filed bankruptcy to avoid the DEQ's bond forfeiture efforts.[41] Debtor hoped that its exclusivity period combined with some defined period following confirmation would provide its parent Goldfields sufficient time to raise funds or obtain financing that Goldfields would advance to Debtor.[42] Debtor would utilize these funds to satisfy the DEQ's bonding requirements.[43] Goldfields expected to raise capital through an initial public offering or another alternative transaction.[44] From the outset, Debtor's reorganization was entirely dependent on Goldfield's ability to raise capital.[45]

Throughout Debtor's bankruptcy, the DEQ expressed a healthy skepticism towards Debtor's ability to reorganize. At the August 29, 2023, hearing on Debtor's Amended Disclosure Statement, counsel for Debtor acknowledged that further proceedings would largely be dictated by the DEQ's preferences, stating that the DEQ holds the "keys in its hand" and is the "big hurdle" that Debtor needed to clear for plan confirmation.[46] Debtor's counsel further indicated that the DEQ was imposing a December 31, 2023, drop dead date by which Debtor needed to raise sufficient bonding in order for any plan to be acceptable to it.

At the same hearing, the Court questioned if there was any real chance for success if the

---

[38] Energy West Resources, Claim No. 2-1; Northwestern Energy, Claim No. 4-1; LD Construction, Claim No. 5-1; Talex Commodities Capital LTD, Claim No. 6-1.

[39] Since Debtor has not scheduled these claims as disputed, contingent or unliquidated, these creditors did not need to file a proof of claim. *Spokane Law Enforcement Fed. Credit Union v. Barker (In re Barker)*, 839 F.3d 1189, 1194 (9th Cir. 2016).

[40] For example, governmental claim amounts account for approximately 99% of all filed claims. This number may fluctuate as the DEQ filed a protective proof of claim that did not indicate the total amount owed by Debtor and some entities' claims, like the Montana Natural Resource Damage Program, are contingent in nature. Regardless, the claims held by government entities account for the vast majority of outstanding debts.

[41] DEQ Ex. 2, Forfeiture Notice at p. 4.

[42] Second Amended Disclosure Statement, ECF No. 76 at pp. 14-16.

[43] *Id.* at p. 16.

[44] Plan, ECF No. 102 at p. 5.

[45] "Montana Goldfields will be the primary source of funding of [Debtor's] bankruptcy plan." Second Amended Disclosure Statement, ECF No. 76 at p. 16.

[46] ECF No. 70.

deadline for the DEQ bond payment was December 31, 2023. In essence, Goldfields had 120 days to raise approximately $40,000,000 dollars and distribute funds to Debtor as needed for the DEQ bond payment. Counsel for the DEQ explained that the DEQ was unwilling to extend the drop-dead date because Debtor had left a "trail of broken promises," including previous failed IPO attempts. Counsel further explained that the DEQ took its obligation to protect the environment seriously and was concerned that a longer delay meant more damage to the environment.

After the August 29, 2023, hearing, Debtor and the DEQ reached an agreement that addressed the DEQ's objections to confirmation.[47] Importantly, the DEQ Stipulation included the following language:

> Effective Date. Shall mean the timely occurrence of each of the following events no later than the date indicated: placement of additional bonds with the DEQ in the amount of $1,500,000 by November 30, 2023; $1,500,000 by December 31, 2023; and the remaining outstanding bond for the current disturbance (L-Pit) by March 31, 2024. Pursuant to the proposed five-year bond determination issued by DEQ on September 12, 2023, the total bonding required by March 31, 2024, is $40,959,321, subject to a 30-day public comment period and the issuance of the final five-year bond determination by DEQ. MTMI shall have, and does reserve, all statutory and regulatory rights to comment upon and challenge the proposed five-year bond determination under applicable non-bankruptcy law.

The DEQ Stipulation also stated that, in the event of Debtor's failure to achieve the Effective Date, the DEQ could immediately and without approval of the Bankruptcy Court, order, direct, or compel a forfeiture of Debtor's bonds and take such further action as permitted by applicable non-bankruptcy law.[48] Debtor further agreed to refrain from engaging in contract milling and operation of its ore concentrator until the bonds were paid in full.[49]

The Court held a hearing on the DEQ Stipulation.[50] At the Stipulation Hearing, the Mooney Group appeared and indicated it might have an interest in acquiring Debtor's assets. Rather than entertain a liquidation proposal, Debtor and the DEQ elected to proceed with the financing plan that was before the Court. Debtor's counsel informed the Court that the Plan provided that in the event the benchmarks were not met and the Effective Date was not achieved, the case would be dismissed.[51] The Court approved the DEQ Stipulation.[52]

---

[47] ECF No. 83 ("DEQ Stipulation"). The DEQ Stipulation resolved a Motion to Modify Stay filed by the DEQ at ECF No. 69.

[48] *Id.*

[49] *Id.*

[50] ECF No. 87 ("Stipulation Hearing").

[51] Plan at ¶ 5.12.

[52] ECF No. 89.

Debtor filed its Plan shortly after approval of the DEQ Stipulation. Pursuant to the terms of the Plan, "default of this Plan shall occur in the event the Effective Date is not timely achieved. In such event, this case shall be dismissed immediately following the failure to timely achieve the Effective Date."[53] The Plan further stated that "[i]n the event [Debtor] fails to obtain loan or initial public offering proceeds sufficient to provide the required bonding as determined by the DEQ by the Effective Date, this case shall be immediately dismissed on motion of any party in interest including [Debtor]."[54]

The Plan Ballot Report shows twelve creditors voted on the Plan.[55] Ten accepted the Plan. Jefferson County and LD Construction voted to reject the Plan. However, after voting to reject the Plan, LD Construction and Debtor entered a stipulation that provided upon approval, LD Construction would be deemed to have withdrawn its objection to confirmation and would further be deemed to have voted to accept the Plan.[56] Neither the UST nor the DEQ objected to the Plan. The Court held a hearing on confirmation and confirmed Debtor's Plan, expressly incorporating all stipulations into the Plan.[57]

### C. Post Confirmation Events & Default

Debtor made its first $1,500,000 bond payment by November 30, 2023.[58] Debtor failed to post the requisite $1,500,000 bond due by December 31, 2023.[59] The DEQ issued a forfeiture notice to Debtor, indicating that Debtor had forfeited the bonds held by the DEQ in relation to Debtor's mining operations.[60]

Debtor's failure to meet the bond payment benchmarks spurred the UST to file the present Motion. After the DEQ filed the Joint Motion suggesting a potential buyer had been found, the Court held the April 10th Status Conference.[61] At the April 10th Status Conference, it became apparent that any potential sales transaction was in its infancy and that the DEQ had opted to open negotiations with the potential buyer, the Mooney Group, without involving Debtor. No sales price, or any other material term had been discussed or exchanged by Debtor and Mooney Group. The parties discussed possible outcomes including plan modification, conversion, and dismissal. The UST consented to limited additional time for the DEQ, Mooney Group, and Debtor to explore

---

[53] Plan at ¶ 5.12.

[54] *Id.* at ¶ 10.02.

[55] ECF No. 95.

[56] ECF No. 96 ("LD Construction Stipulation").

[57] ECF Nos. 103 and 105.

[58] DEQ Ex. 2, Forfeiture Notice at p. 4.

[59] *Id.*

[60] DEQ Ex. 2, Forfeiture Notice.

[61] ECF No. 127.

7

the options. The matter was continued to April 26, 2024.

At the April 26th Status Conference, the UST expressed that he would not consent to any further extension of time.[62] Instead, he urged the Court to immediately dismiss or convert the case, expressing a preference for conversion. The DEQ expressed its optimism about a possible transaction between the Mooney Group and a chapter 7 trustee if the case were converted. Debtor emphasized dismissal was the remedy provided for in the Plan, not conversion.

The Court set a final hearing on the Motion. In connection with their preparation for the final hearing, the Court asked the parties to consider whether the Court could convert the case given the express provisions of Debtor's Plan and whether the property that revested in Debtor at confirmation would revest in the estate if the case were converted.[63]

### D. Testimony regarding conversion or dismissal being in creditors' best interests was unpersuasive

At the hearing, Walsh testified the DEQ did not have any faith in Debtor's ability to complete its required reclamation or provide the necessary deficient bond payments. Walsh explained that if Debtor's case was dismissed, Debtor would have to comply with the bad actor provisions in the MMRA. This would include ridding itself of this status before it could begin mining again. Walsh did not know anything about the Mooney Group, except its expressed interest in possibly acquiring Debtor's assets. Walsh did not know whether various expenses currently paid by Debtor and its parent company would be paid in a conversion, including insurance costs and the employment of the skeletal crew monitoring the site.

Mooney testified that the Mooney Group was in the preliminary stages of its due diligence. The time to complete that due diligence could be six months to two years. He testified that the due diligence he completed on a prior mine acquisition took approximately nine months. Subject to the results of the Mooney Group's due diligence, Mooney indicated that the Mooney Group might present an offer to the chapter 7 trustee. Mooney could not estimate a range for an offer or any opinion of value (or range of value) because to date the information provided has been very limited. He further testified that the Mooney Group would only entertain the possibility of purchasing Debtor's assets if Debtor was in bankruptcy.

Imeson testified that Debtor, with funding from Goldfields, currently paid five employees to monitor the site's environmental issues daily. It also paid insurance premiums on a monthly basis. Imeson stated that if the case were converted neither Debtor nor Goldfields would have any incentive to continue making these payments. Conversely, if the case was dismissed, Debtor and Goldfields' efforts to raise capital would continue. When questioned about the Insiders' acquisition of the tax deed related to all core mining real estate owned by Debtor, Imeson explained that acquiring the tax deed was necessary to prevent the loss of Debtor's most important asset, the mine.

If Debtor's case is dismissed, Imeson testified that Debtor and the Insiders would work with their creditors to resolve outstanding issues. In response to questioning from LD Construction's counsel, Imeson explained Debtor and LD Construction might have resolved their

---

[62] ECF No. 141.

[63] ECF No. 142.

prepetition dispute, but the bankruptcy prevented Debtor from treating LD Construction differently than other creditors in the same class. Implicit in this testimony is the suggestion that if the case is dismissed, Debtor will revisit its prepetition efforts to pay its unsecured creditors free from any limitations it encountered post-petition. Conversely, dismissal would not resolve Debtor's bad actor status. Imeson acknowledged Debtor's "bad actor status" would have to be addressed but did not provide any details regarding the method or means of doing so. Presumably, like each of Debtor's problems, the answer is tied to capital.

## IV. Parties' Positions

The UST, the DEQ, and LD Construction all favor conversion ("Conversion Parties"). Alternatively, the Insiders and Debtor argue dismissal is the exclusive remedy following default under the Plan ("Dismissal Parties"). The Conversion Parties arguments focus on the Bankruptcy Code, while the Dismissal Parties rely on the Plan.

The Conversion Parties contend that, pursuant to § 1112(b), cause exists to dismiss or convert Debtor's chapter 11 case because Debtor materially defaulted under its Plan when it failed to make the payment required to meet the bonding deadline.[64] They argue conversion is in the best interest of creditors because there is significant equity in the assets that will comprise the chapter 7 estate following conversion. Liquidation of these assets will provide a better outcome for creditors than dismissal.[65]

The Conversion Parties disregard the Dismissal Parties' reliance on the Plan because it conflicts with § 1112(b), which requires consideration of the best interests of creditors. Rather than consider the Plan's language in a vacuum, the Conversion Parties urge the Court to disregard the language in the confirmed Plan almost entirely in favor of § 1112(b). Underlying the Conversion Parties' arguments is the fear that, absent conversion, the real property held by Debtor, including the proposed mining expansion area, will transfer by tax deed to Goldfields.[66] Additionally, the Conversion Parties argue that conversion is in the best interest of creditors because Debtor and insider Imeson are prohibited by the MMRA's "bad actor" provisions from engaging in mining or exploration activities in the state of Montana, either through Debtor or its affiliates as a result of the DEQ's bond forfeiture.[67]

The Dismissal Parties argue that every iteration of Debtor's Plan indicated that default would result in dismissal.[68] No parties objected to the inclusion of this provision.[69] Additionally, the Dismissal Parties also argue that, notwithstanding the language in the Plan mandating dismissal

---

[64] Motion, ECF No. 114 at pp. 3-4.

[65] This conclusion is dependent on all of Debtor's assets comprising the chapter 7 estate if conversion occurs.

[66] DEQ Objection to Motion to Dismiss, ECF No. 146 at p. 11.

[67] *Id.* at pp. 11-12.

[68] Insiders' Brief in Support of Dismissal, ECF No. 152 ("Insiders' Brief") at p. 2.

[69] *Id.*

as the exclusive remedy upon default, dismissal is also in the best interests of creditors because conversion's benefits are illusory.[70] They note that the prospective buyer, Mooney Group, has made no assurance it will purchase Debtor's assets if the case is converted to chapter 7, have not discussed a purchase price, have not signed a letter of intent, and have not committed any earnest money or other funds to the transaction.[71] Instead, as Imeson testified, the best interest of creditors will be served by dismissal because it will permit Debtor and Goldfields to pursue their efforts to raise capital which is the key to resolving Debtor's problems.

V.     Applicable Law and Analysis

The Dismissal Parties argue that the Plan is controlling and dictates that the exclusive remedy following plan default is dismissal. The Conversion Parties urge the Court to confine its analysis to § 1112(b) and conclude conversion is in the best interests of creditors. Both parties' predictions regarding the outcomes likely under either dismissal or conversion relied on optimistic forecasts of future events. Neither persuaded the Court that their forecast was better than the other.

Generally, if a debtor defaults under its confirmed plan, a creditor has two options: move to convert or dismiss the case or enforce the plan under non-bankruptcy law. Section 1112(b) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . If cause is established, "the decision whether to convert or dismiss the case falls within the sound discretion of the court." *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 612 (B.A.P. 9th Cir. 2014). Alternatively, "because the obligations under a confirmed plan supplant the prior debts of the Chapter 11 debtor, enforcement of the confirmed plan is not required: the unpaid creditor can sue to enforce the new obligation under non-bankruptcy law." *In re Charleston Assocs., LLC*, 2018 Bankr. LEXIS 2227, at *14 (Bankr. D. Nev. 2018).

Here, the UST's Motion seeks to dismiss or convert Debtor's case pursuant to § 1112(b). The movant bears the burden of establishing by a preponderance of the evidence that cause exists to convert or dismiss. *In re Sullivan*, 522 B.R. at 614. If a party establishes cause, dismissal or conversion is mandatory under § 1112(b)(1). *See In re Aurora Memory Care LLC*, 589 B.R. 631, 637 (Bankr. N.D. Ill. 2018) (explaining that Congress amended the Bankruptcy Code in 2005 to make conversion or dismissal mandatory if movant meets burden of proof, absent application of § 1112(b)(2)). Section 1112(b)(4) contains a non-exhaustive list of circumstances that constitute cause for conversion or dismissal, including a debtor's failure to file monthly operating reports, pay the full amount of quarterly fees owed to the UST, or a material default under the plan.

In determining whether conversion or dismissal post-confirmation, a court must consider the "best interests of the creditors." § 1112(b).[72] The Bankruptcy Code does not define the best

---

[70] *Id.* at p. 11.

[71] *Id.* at p. 14.

[72] Where property revests with the debtor upon confirmation, as is the case here, a court does not consider the interests of the now non-existent estate. *See, e.g., In re Swing House Rehearsal & Recording, Inc.*, 2023 Bankr. LEXIS 1221, at *12 (Bankr. C.D. Cal. 2023) ("Technically speaking, since the confirmed reorganization plan vested property of the estate in the reorganized debtor, the estate no longer exists, and the court does not consider the interests of the estate as opposed to the

10

interests of creditors. 7 Collier on Bankruptcy ¶ 1112.04[7] (16th ed. 2024). Instead, courts consider a variety of factors. *Id*. Courts have disfavored conversion when the benefits are speculative. *See, e.g., In re T.S.P. Indus., Inc.*, 120 B.R. 107, 111 (Bankr. N.D. Ill. 1990) (conversion should not be "used as a pretext for a fishing expedition, especially when the lake looks so barren."). Similarly, courts have considered the difficulty associated with administering a chapter 7 estate post-conversion and the administrative costs associated with conversion. *5757 Wilshire, LLC v. Ciling (In re Ciling)*, 2023 Bankr. LEXIS 82, at *10 (B.A.P. 9th Cir. 2023); *Baroni v. Seror (In re Baroni)*, 36 F.4th 958, 970 (9th Cir. 2022). When determining the best interests of creditors, the bankruptcy court must determine whether dismissal or conversion is in the best interest of all creditors – "not just the largest and most vocal creditor." *In re Sullivan*, 522 B.R. at 613.

> A. **The Motion presupposes relief under § 1112(b) is available despite the confirmed Plan requiring immediate dismissal upon Debtor's failure to achieve the Effective Date**

A confirmed plan operates as a final judgment. *Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972 (9th Cir. 2005). A final order of a federal court may not be collaterally attacked. *Alakozai v. Citizens Equity First Credit Union (In re Alakozai)*, 499 B.R. 698, 704 (B.A.P. 9th Cir. 2013). As this Court previously explained:

> If parties do not exercise available avenues for relief through either a timely appeal or a Rule 60(b) motion, they may not pursue de facto challenges to the relevant order or judgment in another proceeding. This collateral attack doctrine prevents courts from effectively overruling or altering final orders via indirect routes and is firmly grounded on the need for finality.

*Foster v. First Interstate Bank (In re Shoot the Moon, LLC)*, 642 B.R. 21, 24 (Bankr. D. Mont. 2022). On its face, the position asserted by the Conversion Parties is difficult to reconcile with the confirmed Plan and Confirmation Order.

"Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to res judicata effect." *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995). Res judicata "promotes fairness to parties who have negotiated and relied upon Chapter 11 plans and supports the strong policy of finality in the reorganization process." *Rosenstein & Hitzeman, AAPLC v. Eliminator Custom Boats, Inc. (In re Eliminator Custom Boats, Inc.)*, 2019 Bankr. LEXIS 2998, at *18 (B.A.P. 9th Cir. 2019). Whether dismissal is the exclusive remedy under the Plan (thus precluding consideration of conversion) hinges on the provisions of the confirmed Plan.

> 1. **The Plan unambiguously requires dismissal if Debtor failed to achieve the Effective Date**

The confirmed plan acts as a new and binding contract between a debtor and its creditors. *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993). A bankruptcy plan is to be interpreted as a contract, pursuant to applicable state law. *Id*. Under Montana law, contract language is interpreted according to its plain meaning. *GRB v. Christman Ranch, Inc.*, 108 P.3d 507, 509 (Mont. 2005). If the language of a contract is unambiguous – "i.e., reasonably susceptible to only one construction - the duty of the court is to apply the language as

---

creditors.").

written." *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 164 P.3d 851, 857 (Mont. 2007). An ambiguity exists when the contract language reasonably may be subject to two different interpretations. *GRB*, 108 P.3d at 510.

The Dismissal Parties argue that the Plan unambiguously narrows default remedies to dismissal. The Conversion Parties argue that dismissal is merely Debtor's "preference."[73] Here, the Court can find nothing ambiguous in Debtor's confirmed Plan. Debtor's Plan provides:

> A default of this Plan shall occur in the event the Effective Date is not timely achieved. In such event, this case shall be dismissed immediately following the failure to timely achieve the Effective Date.[74]

The Plan identifies an event – failure to achieve the Effective Date.[75] The Plan further specifies the consequences that follow this occurrence – dismissal.

The DEQ urges this Court take a broader view of the Plan and construe dismissal as Debtor's preference and not an exclusive remedy. First, nothing in the Plan suggests alternatives to dismissal are available if the Effective Date is not achieved. Instead, according to the Plan's plain terms, "this case shall be dismissed immediately following the failure to timely achieve the Effective Date." Additionally, it explains, "in the event [Debtor] fails to obtain loan or initial public offering proceeds sufficient to provide the required bonding as determined by the DEQ by the Effective Date, this case shall be immediately dismissed on motion of any party in interest including [Debtor]." The inclusion of "shall be immediately dismissed" forecloses any possibility of conversion.[76]

### 2. Prior to confirmation, none of the Conversion Parties objected the Plan's inclusion of dismissal as the remedy if the Effective Date was not achieved.

The "hallmark of chapter 11 is a flexibility in which the content of plans is primarily up to the genius of the drafter." *Alary Corp. v. Sims (In re Associated Vintage Group, Inc.)*, 283 B.R. 549, 560 (B.A.P. 9th Cir. 2002). As the *Alary Corp.* court explained:

> Chapter 11 is essentially a structured negotiation conducted under rules prescribed by the Bankruptcy Code. Those negotiations take a variety of forms. Some chapter 11 plans need only resolve a few discrete disputes. Others must deal with a plethora of problems. The proposing of a plan and subsequent modifications may be part of the negotiation.

---

[73] DEQ Objection to Motion to Dismiss, ECF No. 146 at p. 3.

[74] Plan at ¶ 5.12.

[75] See Plan at p. 4. Like the DEQ Stipulation, the Plan defines the Effective Date as:

> the timely occurrence of each of the following events no later than the date indicated: placement of additional bonds with the DEQ in the amount of $1,500,000 by November 30, 2023; $1,500,000 by December 31, 2023; and the remaining outstanding bond for the current disturbance (L-Pit) by March 31, 2024.

[76] Plan at ¶ 5.12.

12

*Id.* In short, the flexibility of chapter 11 allows a debtor to draft (and creditors to negotiate) a plan that best serves the purposes of both the debtor and its creditors.

If a creditor fails to timely object to a plan or appeal a confirmation order, "it cannot later complain about a certain provision contained in a confirmed plan, even if such a provision is inconsistent with the Code." *In re Crown Vantage, Inc.*, 421 F.3d 963 at 972 (citing *Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172 (9th Cir. 2004)).[77] Thus, any objections to provisions contained within a chapter 11 plan should be registered prior to confirmation. *Id.*

Neither the DEQ, LD Construction, nor the UST objected to the Plan and its explicit inclusion of a singular remedy should Debtor fail to achieve the Effective Date. To the contrary, although LD Construction and the DEQ objected to the Plan, their objections involved other issues. Ultimately, each of their objections were resolved pursuant to the DEQ and LD Construction Stipulations. Following approval of their respective Stipulations, no further objections were made and the Plan, including paragraph 5.12, which included the very language and outcome to which they now object, was confirmed.

The DEQ's position today is irreconcilable with the positions it took prior to confirmation. The DEQ took the position early in Debtor's case that any delay "may result in deleterious impacts to human health and the environment and DEQ."[78] The DEQ's desire for certainty and finality on an expedited basis in Debtor's case stemmed from the "broken trail of promises" left by Debtor prepetition. Conversely, Debtor's position has always been clear. As every iteration of the Plan and its accompanying Disclosure Statement make clear, failure to achieve the Effective Date would result in the dismissal of Debtor's case.

Like any other party, the UST is bound by the Plan. As the Tenth Circuit B.A.P. stated in *United States Trustee v. Craige (In re Salina Speedway)*, a "confirmed plan precludes the UST from raising claims or issues that could have or should have been raised before confirmation but were not." 210 B.R. 851, 855 (10th Cir. 1997). In *In re Salina Speedway*, the UST moved to include quarterly fees after the debtor's confirmed plan failed to provide them. *Id.* at 852. The Tenth Circuit B.A.P. decided that not only did the confirmed plan preclude the UST from raising the issue, principles of res judicata prevented the UST from "relitigat[ing] what it should have litigated at the confirmation hearing." *Id.*

While in *In re Salina Speedway* the UST had a pecuniary interest in the outcome of the interpretation of the debtor's plan, this distinction does not weigh in favor a different result. While the UST does not have a pecuniary interest in this case, other bankruptcy courts have found that res judicata prevents the UST from raising issues that should have been raised prior to confirmation, irrespective of whether it had a pecuniary interest in the outcome. *See, e.g., In re Burkes*, 2023 Bankr. LEXIS 2401 (Bankr. E.D. Wis. 2023). In *In re Burkes*, the bankruptcy court concluded that principles of res judicata barred the UST from moving to dismiss the debtor's case for bad faith premised on debtor's pre-confirmation conduct because the confirmation order explicitly stated that the plan was filed in good faith. *Id.* at *7-8. Since the UST did not raise the

---

[77] See also *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083, 1086 (9th Cir. 1999).

[78] DEQ's Conditional Consent to Debtor's Motion to Extend Exclusivity Period, ECF No. 37 at p. 6.

13

bad faith issue or otherwise object to confirmation, it could not do so post-confirmation. *Id.* at *14-15. Here, the UST is bound by the Plan like every other party.

Finality bars the Conversion parties from now challenging a provision that should have been challenged at or prior to confirmation. Debtor's intent to include such a provision was apparent from the start. Each iteration of the Plan and its accompanying Disclosure Statement indicated that Debtor's case would be dismissed if it failed to meet the bonding benchmarks. Counsel for Debtor indicated as such in the various hearings prior to confirmation. When the Plan was confirmed, it became binding on all parties, and the confirmation order is now entitled to res judicata effect. Allowing the Conversion Parties to now gloss over the plain language of the Plan, characterize it as Debtor's "preference"[79] and urge conversion finds no support in the record. At best, it reflects a misunderstanding of the Plan. At its worst, it is tantamount to an impermissible collateral attack on a final order.[80]

### B. Even if relief were available as a remedy, the Conversion Parties failed to establish conversion is in the best interests of creditors.

It is important to note that the record does not establish conversion, if available, would be in all creditors' best interests. The movant bears the burden of establishing by a preponderance of the evidence that cause exists. *In re Sullivan*, 522 B.R. at 614. If the moving party seeks conversion over dismissal (or vice versa), the moving party bears the additional burden of demonstrating why the requested alternative is in the best interests of creditors. 7 Collier on Bankr. ¶ 1112.04[4] (16th ed. 2024). Having considered the testimony and admitted exhibits, the Court is not persuaded the Conversion Parties have met this burden. At best, the testimony suggests conversion's benefits are speculative. The assets to be acquired are complicated and tainted with legacy issues that may give the Mooney Group or any other buyer pause. Despite their interest, neither the Mooney Group nor any other buyer have agreed to enter into any agreement contingent on conversion.

Unlike creditors like LD Construction that may simply have a monetary claim, the DEQ and the Environmental Protection Agency ("EPA") have claims that include monetary and regulatory enforcement components. Conversion will not easily or effectively address the various MMRA regulatory issues that exist. For example, the EPA holds a proof of claim in the amount of $9,993,796.88 in Debtor's Case.[81] This claim stems from the EPA's response to mine contamination pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Debtor's liability under CERCLA. While the economic component of CERCLA liability is important, conversion is not synonymous with achieving

---

[79] *Id.*

[80] "Unlike a direct appeal, a collateral attack questions the validity of a judgment or order in a separate proceeding that is not intended to obtain relief from the judgment." *Uecker & Assocs. v. L.G. Hunt & Assocs. (In re Am. Basketball League, Inc.)*, 317 B.R. 121, 128 (Bankr. N.D. Cal. 2004). Confirmation orders may not be collaterally attacked. *Smith v. Charter Communs., Inc.*, 467 Fed. Appx. 742, 743-44 (9th Cir. 2012) (affirming district court that creditor could not raise claims waived in confirmed chapter 11 plan).

[81] Claim No. 8-1.

CERCLA's overarching purpose of the timely clean up and reclamation of hazardous sites.[82]

Alternatively, dismissal will not leave governmental claimants, who account for all but a fraction of the claims, without a remedy. Debtor's non-insider creditors total 13. Of the 13, seven are government units – the DEQ, EPA, BLM, IRS and a few others. These entities generally have a wide range of power to coerce compliance and payment from debtors both in and outside of bankruptcy. For example, as already shown in this case, the DEQ, as the state agency tasked with ensuring compliance with mining regulations, retains broad power under the MMRA to ensure compliance with reclamation standards and bonding requirements. The DEQ has already exercised this power by enforcing its interests in the bonds. These agencies have the power to compel compliance under various statutes.

Notwithstanding the ability of the various regulatory agencies to protect their interests regardless of whether the case is converted or dismissed, the test is the best interests of all creditors, not simply the largest creditor. To that end, Imeson's testimony indicated Debtor continued to enjoy a working relationship with most unsecured claimants.[83] Imeson further suggested that Debtor and Insiders would be willing to work with creditors post-dismissal and had paused these efforts due to Debtor's bankruptcy. Imeson's testimony was credible, and the Court anticipates that if this case is dismissed, Imeson will immediately undertake efforts to address claims like the one asserted by LD Construction. If he fails to do so, those creditors may exercise the full range of non-bankruptcy related remedies at their disposal.

Finally, prior cases in this district demonstrate conversion is not always a panacea that produces the outcomes creditors expect. In *In re Knie* the chapter 7 trustee undertook significant efforts to liquidate certain real property.[84] Prior to doing so, he had to engage with various stakeholders and local government. A host of issues had to be considered and agreements reached before he could be successful. The task was far more difficult than initially expected. Those efforts began in 2009. The efforts were recently completed, after the passage of 15 years.[85] The results in that case were not consistent with the parties' expectations when conversion was embraced as an alternative to dismissal 15 years ago. With the benefit of hindsight, a compelling case could be made that dismissal would have been better at that time. This Court is not persuaded that conversion would be in all creditors' best interests.

---

[82] *AmeriPride Servs. v. Tex. Eastern Overseas, Inc.*, 782 F.3d 474, 487 (9th Cir. 2015) (stating that although CERCLA's secondary focus is "assuring that responsible persons pay for the cleanup," CERCLA's primary purpose is protecting the public health and environment).

[83] While Imeson did not identify these claimants, presumably he referred to the various utility entities, such as Northwestern Energy, who filed claims in Debtor's case.

[84] Case No. 2:09-bk-61104-WLH.

[85] *Id.* This is not a criticism of the chapter 7 trustee. Instead, it is the recognition that debtors and creditors' assertions about equity are not always born out after the chapter 7 trustee retains professionals and encounters legacy issues neither creditors nor debtors disclosed when championing conversion as an alternative to dismissal. Further, in this case the intersection between the Bankruptcy Code and environmental regulations can be "messy," and "conflict and confusion are almost inevitable." *California Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 928 (9th Cir. 1993). The record suggests this case would not be a simple liquidation.

**VI. Conclusion**

Given the record, even if conversion remained an alternative to dismissal under the Plan, the Conversion Parties did not satisfy their burden of proof and establish conversion was in the best interest of all creditors. At best, the evidence shows that the DEQ, LD Construction and the UST prefer conversion. Conversely, Debtor's insistence on dismissal as the exclusive remedy is anchored in its confirmed Plan, a plan that was accepted by the DEQ and LD Construction and uncontested by the UST. The confirmed Plan is entitled to finality and its terms mandate dismissal of this case.

Dated July 17, 2024.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana