UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**MONTANA TUNNELS MINING, INC.,**<br><br>Debtor. | Case No. **2:22-bk-20132-BPH** |

## DECISION AND RATIONALE

In this Chapter 11 bankruptcy,[1] creditor Jefferson County, Montana ("Jefferson") filed a motion pursuant to Fed. Bankr. P. 9024 requesting relief from this Court's orders[2] on October 22, 2024, at ECF No. 167 ("Relief Motion"). The Relief Motion requests that this Court set aside its prior orders: (a) confirming the plan at ECF No. 105 ("Confirmation Order"); and (b) dismissing this case at ECF No. 164 ("Dismissal Order"). It urges this Court to revisit issues that were the subject of prior litigation, reopen this closed case, and convert the case to one under Chapter 7. Objections and responses to the Relief Motion were filed by the U.S. Trustee ("UST") (ECF No. 174); Goldfields Funding Partners, LLC (ECF No. 177); and Debtor (ECF No. 178).

The Montana Department of Environmental Quality ("DEQ") filed a response in support of the Relief Motion at ECF No. 179. Further replies were filed by Jefferson, Debtor, and Black Diamond Acquisition Partners, Black Diamond Holdings LLC, Elkhorn Goldfields, Inc., Goldfields Funding Partners, LLC, Patrick Imeson, and Montana Goldfields Inc. (collectively "Goldfields Parties").

A hearing was held on December 11, 2024 ("Relief Hearing").[3] Appearances were noted on the record. This Court heard testimony from Terri Kunz—treasurer of Jefferson—and Patrick Imeson—CEO of Debtor. Exhibits 1–6 and 12 were admitted. For the reasons below, the Relief Motion is denied.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Civil Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Civil Rules of Civil Procedure.

[2] The orders at issue are at ECF No. 163 and 164.

[3] The December 11, 2024, hearing will be referred to as the "Relief Hearing." At the conclusion of the hearing, the parties elected to participate in a Judicial Settlement Conference. Those efforts concluded March 17, 2025. ECF No. 195.

1

I. **Jurisdiction**

Pursuant to 28 U.S.C. 1334(a) and by referral from the district court, bankruptcy courts enjoy original and exclusive jurisdiction of all cases under title 11, along with "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Within this framework, matters subject to bankruptcy court jurisdiction are further distinguished as core and non-core. "Matters concerning "administration of the estate" and "confirmation of a plan" are core matters under 28 U.S.C. § 157(b)(2)(A) and (L). *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 611 (BAP 9th Cir. 2014).

Following confirmation of a plan, a bankruptcy courts "related to" jurisdiction is limited to matters that have a close nexus to the plan, generally those "affecting 'the interpretation, implementation, consummation, execution, or administration of the confirmed plan . . . ." *Pegasus Gold Corp. v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005) (quoting *Binder v. Price Waterhouse & Co., LLP (In re Resorts Intern., Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004)).

II. **Procedural History**

    **A. Following Debtor's default under the confirmed Plan, this case was dismissed after a contested hearing**

Debtor's third amended Chapter 11 plan (ECF No. 102) ("Plan") was confirmed in October 2023.[4] DEQ accepted the Plan.[5] Although Jefferson did not object to the Plan, it voted to reject it.[6] Under the Plan, the "Effective Date" was a defined term. It required Debtor increase its bonding capacity consistent with the following:

(a) $1,500,000 by November 30, 2023;
(b) $1,500,000 by December 31, 2023;
(c) and the remaining outstanding bond for the current disturbance (L-Pit) by March 31, 2024.[7]

The Plan also included the following term:

A default of this Plan shall occur in the event the Effective Date is not timely achieved. In

---

[4] Order confirming Plan is at ECF No. 105. In a prior decision this Court recited the basis for confirmation. *See* ECF No. 163, incorporated by reference.

[5] ECF No. 95, "Montana Natural Resource Program"

[6] *Id*.

[7] ECF 102, 4.

such event, this case shall be dismissed immediately following the failure to timely achieve the Effective Date.[8]

Four months after confirmation, the UST filed a motion to dismiss or convert the case, citing failure to pay statutory fees under § 1112(b)(4)(K) and material default under the terms of the Plan pursuant to § 1112(b)(4)(N).[9] DEQ and Debtor filed responses.[10] DEQ confirmed in its response that the Debtor had failed to post the December 31, 2023, bond, and was in default. It argued:

> The Debtor's failure to remit to DEQ the $1,500,000 bond payment due by December 31, 2023, constitutes a material default under the Plan, i.e., a failure to achieve the Effective Date, <u>and consequently the express terms of ¶ 5.12 of the Plan, call for Debtor's Chapter 11 to be dismissed immediately</u> [emphasis added].[11]

Immediately below its explicit recognition the Plan required dismissal, DEQ hinted that conversion may be a better alternative. Debtor filed a consent to the motion to dismiss on April 5, 2024.[12]

Following Debtor's consent, creditor LD Construction, Inc. ("LD") filed a motion to convert.[13] A series of hearings and motions ensued, arguing the merits of dismissal or conversion.[14] A final hearing was held on whether to dismiss or convert the case on June 6, 2024.[15] During the Dismissal Hearing, this Court emphasized the primary issue was the legal question of whether conversion was precluded by the plain language of the Plan and confirmation. It stated, "no one here . . . has discussed the fundamental question. Okay? Which is that you all have a plan, it was confirmed, no one objected to the explicit remedy included in the plan . . . ."[16] Additionally it asked the parties, "what about all of that law that says that once a plan is confirmed it is binding on the debtor and the creditors . . . . Why shouldn't the Debtor get

---

[8] Plan 5.12. ECF No. 102, 10.

[9] ECF No. 114.

[10] ECF Nos. 117 and 118, respectively.

[11] ECF No. 117

[12] ECF No. 123.

[13] ECF No. 126.

[14] Hearings – ECF Nos. 128; 139; and 162; filings related to the motion to convert – ECF Nos. 132; 138; 144; 146; 147; 152.

[15] ECF No. 162. This hearing shall herein be referred to as "Dismissal Hearing."

[16] ECF No. 162, 2:19:00–2:19:25.

the same benefits it negotiated in the plan that the DEQ got?"[17] Lastly, this Court recounted to DEQ,

> This is a fundamental term, it is a narrowly defined remedy for default in the Plan. And what I am being asked to do now is entirely disregard it, reopen the contract, and allow everyone to say "throw out the plan judge, it really didn't mean anything, and now lets revisit it with the benefit of hindsight." . . . I think there are fundamental questions here about what does it mean to confirm a plan? And are we going to enforce plans that are confirmed or are we going to sort of open it up after it's confirmed . . . .[18]

DEQ's response was, generously, evasive—asking this Court to consider the best interests of creditors without any consideration of the significant legal questions that were raised by requesting relief that was inconsistent with the confirmed plan.

Following the Dismissal Hearing, this Court concluded the Plan explicitly identified dismissal as the remedy following default. It explained that conversion presupposes relief under § 1112(b) is available despite the confirmed Plan requiring immediate dismissal upon Debtor's failure to achieve the Effective Date. It observed, "[o]n its face, the position asserted by the Conversion Parties is difficult to reconcile with the confirmed Plan and Confirmation Order."[19] It relied on well established principles, including, "'Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to res judicata effect.'"[20] And, "Res judicata 'promotes fairness to parties who have negotiated and relied upon Chapter 11 plans and supports the strong policy of finality in the reorganization process.'"[21] Rather than rewrite the confirmed Plan, this Court dismissed the case.[22]

Although unnecessary to its ultimate decision, this Court further explained that, even if relief were available under § 1112(b), it was not persuaded conversion would be in the best interests of creditors.[23] It stated, "[e]ven if relief were available as a remedy, the Conversion

---

[17] ECF No. 162, 2:28:10–2:29:25.

[18] ECF No. 162, 2:48:00–2:50:03.

[19] ECF No. 163, 11.

[20] ECF No. 163, 11 (citing *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995)).

[21] ECF No. 163, 11 (citing *Rosenstein & Hitzeman, AAPLC v. Eliminator Custom Boats, Inc. (In re Eliminator Custom Boats, Inc.)*, 2019 Bankr. LEXIS 2998, at *18 (BAP 9th Cir. 2019)).

[22] ECF No. 164. The memorandum at ECF No. 163 and the order dismissing the case will herein be referred to collectively as "Dismissal Order."

[23] ECF No. 163, 14–15.

4

Parties failed to establish conversion is in the best interests of creditors." It highlighted the relatively small number of creditors in this case and the availability of other remedies to many of those creditors, specifically the governmental units, like DEQ. The Dismissal Order was not appealed by any party.

### B. The Parties' prior positions in the case, and the positions the parties are taking now related to the Relief Motion

#### 1. Arguments for Conversion now

Jefferson now seeks relief from this Court's orders, confirming the Plan, and dismissing the case, after having failed to: (a) protect its interests by timely objecting to the Plan; (b) appealing the Confirmation Order; (c) object to dismissal of the case (or move for conversion); and, (d) appealing the order dismissing the case. The Confirmation Order was entered more than a year before the Relief Motion. The Dismissal Order was entered three months before the Relief Motion. Jefferson neither participated in the litigation that resulted in those orders or appealed or appealed the orders.

Despite its decision not to meaningfully participate in this case until after it was dismissed and closed, Jefferson now seeks extraordinary relief arguing the case should be reopened because: (1) this Court was mistaken when it opined that conversion would not be in the best interests of creditors; (2) Patrick Imeson misled this Court when he testified that Debtor would pay creditors outside of bankruptcy; and (3) dismissal was inequitable. It also questions the Confirmation Order and seizes upon a scrivener's error in the Plan arguing the scrivener's error justifies vacating the Confirmation Order.[24]

DEQ joins Jefferson in the Relief Motion arguing the Dismissal Order should be vacated, the case reopened, and the case converted to Chapter 7, despite DEQ having actively litigated each of these issues, lost and failed to appeal any of the prior orders. Prior to confirmation, DEQ negotiated short deadlines for Debtor to obtain funding and post additional bonds. As this Court noted at the Dismissal Hearing, DEQ "basically drove the reorganization and the terms included in the Plan . . . ."[25] When Debtor defaulted, DEQ wasted no time enforcing its interest in the existing bonds.[26]

After realizing the benefit of its bargain (enforcing its interest in the existing bonds), DEQ urged this Court to rewrite the Plan, ignore the plain language of the Plan, and afford a buyer it selected and identified an unfettered opportunity to do due diligence and acquire Debtor's assets. This Court denied this request and DEQ did not appeal the Dismissal Order.

---

[24] ECF No. 105. This argument was included in the Motion under Civil Rule 60(b)(6) and will be discussed in that section, *infra* III.3.

[25] ECF No. 162, 2:28:30–2:28:

[26] ECF No. 117-1 ("Notice of Bond(s) Forfeiture").

5

Instead, it waited nearly four months to join the Relief Motion.

During the Relief Hearing, the Conversion Parties again focused on the best-interests-of-creditors test under § 1112(b). The Conversion Parties primarily advanced the same three arguments outlined in their brief: (1) this Court insufficiently considered the issue of the tax deed process, which upon completion would convey absolute title to Goldfield Fundings Partners LLC, free of most pre-issuance liens, including the mining extract tax liens;[27] (2) this Court was misled by Mr. Imeson since his bad actor status could not be cured with respect to the existing mining site; and (3) equity weighed in favor of conversion. This Court heard the testimony of Jefferson's treasurer Terri Kunz, and a potentially interested buyer, James Mooney of the Mooney Group.[28]

Of the three arguments, the Conversion Parties focused significant attention on the tax deed issue, which this Court previously considered at the Dismissal Hearing. As described by the Conversion Parties, Jefferson has two types of taxes assessed against Debtor—real property taxes and mining extract taxes.[29] Goldfield Funding Partners LLC purchased an assignment of Jefferson's tax lien for outstanding property taxes on December 21, 2021.[30] Jefferson received approximately $5 million in exchange for the assignment, which remains subject a to a three-year-redemption process by any interested party.[31] Concurrently, Jefferson had outstanding metal extraction taxes of $3 million. In July 2024, the redemption period for the property taxes expired, allowing Goldfield Funding Partners LLC to request a "tax deed" to the property.[32]

Under Montana law, a tax deed will convey the property "free of all encumbrances

---

[27] Mont. Code Ann. 15-18-214. Jefferson referred to this process as "washing" liens. ECF No. 167, 12. While this Court questions this characterization, for consistency. This Court will similarly refer to this process colloquially as "washing junior liens." However, this Court has considered the statutorily prescribed process of conveying absolute title, despite the use of this casual phrase.

[28] This Court heard testimony from James Mooney at the Dismissal Hearing. ECF No. 141. James Mooney's testimony at the Relief Hearing was generally consistent with his testimony at the Dismissal Hearing. The Mooney Group would not consider any concrete offers on Debtor's assets until the completion of an extensive due diligence process. During the Dismissal Hearing, James Mooney estimated that this process could be anywhere from six months to over two years. The Mooney Group has also taken the position that the sale would need to be conducted under bankruptcy court supervision and subject to its approval.

[29] ECF No. 167.

[30] ECF No. 180, 6.

[31] ECF No. 186, 0:10:10–0:10:25. Mont. Code. Ann. § 15-18-111(1).

[32] ECF No. 180, 6.

6

except as provided in [§] 15-18-214(1)." Mont. Code. Ann. § 15-18-413(3) (2023). The exceptions outlined include claims "when the claim is payable after the execution of the deed and: . . . a lien of any special, rural, local improvement, irrigation, or drainage assessment is levied against the property." MCA § 15-18-214(1)(a)(ii). Jefferson argues that issuing the tax deed "*may* extinguish all inferior liens including *potentially* [Jefferson]'s $3 million lien for unpaid extraction taxes[]" under the statutory framework.[33]

DEQ argues that this Court was mistaken about the effect of the "bad actor" status under Montana law. DEQ argues that under Montana's Metal Mine Reclamation Act ("MMRA"), the bond forfeiture that occurred following default bars Imeson from operating any mines in Montana. MCA § 82-4-360(1). That section allows for a person to apply for an operating permit if they take certain steps to cure, namely payment to DEQ and remedy of the conditions that led to the forfeiture. MCA § 82-4-360(2). However, according to DEQ a successful cure of the default would only allow Debtor and Imeson to apply for *new* permits.[34] DEQ argues this Court was mistaken because it relied on Imeson's representations that Debtor could continue to operate the mine to pay back creditors.[35]

Lastly, the Conversion Parties argue that this Court should exercise its equitable powers and convert the case because, otherwise, "Debtor and its insiders . . . will continue to be a drain on the entire County financially and environmentally."[36] Counsel for Jefferson argued at the Relief Hearing that "you can't just use interlocking LLCs who are all part of the same alter ego to wash tax liens."[37] In essence, the Conversion Parties argue that the combination of the bad actor status and the tax deed would foreclose any possibility of repayment for creditors and that the only solution is to lock Debtor in Chapter 7, irrespective of the language in the confirmed Plan.

### 2. Arguments for Continued Dismissal

To date Goldfields Funding Partners, LLC and Debtor are the only parties that have actively participated in the case and taken consistent positions. DEQ has actively participated,

---

[33] ECF No. 180, 7 (emphasis added). In essence by accepting $5 million for the assignment, Jefferson may have inadvertently set in motion a statutory process that upon completion extinguished their own junior interest that corresponded to metal extraction taxes.

[34] ECF No. 179, 10.

[35] ECF No. 179, 10–11.

[36] ECF No. 167, 12. This Court is sympathetic to Jefferson when it complains a mine that does not operate is a drain on its resources. This Court's sympathy is tempered by Jefferson's failure to protect its interests throughout the case. Further, relief must be anchored in authority, not sympathy.

[37] ECF No. 187, 01:16:26–01:16:35

7

but the positions it has taken have not been consistent. Despite the short bonding deadlines DEQ negotiated with Debtor, Debtor went forward, confirmed its Plan, and defaulted under the Plan. It consented to dismissal but was forced to litigate the plain language of the Plan when parties advocating dismissal reversed course and urged wholesale abandonment of the terms in the Plan in favor of conversion. Now, despite the failure of DEQ, or any other party to timely appeal this Court's Order dismissing the case, Debtor is required to argue again the finality and res judicata effect that are afforded reorganization plans and confirmation orders. Goldfields and Debtor argue dismissal should not be disturbed and the case should remain closed.[38]

The Dismissal Parties generally reiterated the arguments from the Dismissal Hearing.[39] Additionally, Debtor argues that the Conversion Parties' arguments are generally recycled from the Dismissal Hearing and should have been appealed, not used to support a Civil Rule 60(b) motion.[40] At the Relief Hearing, the Debtor pointed out that Jefferson neither filed any motions related to the motion to dismiss nor attended the previous Dismissal Hearing.[41] Further Jefferson, never filed an appeal.[42] According to Goldfield Parties, the inaction occurred despite Goldfield Funding Partners LLC contacting the treasurer in April or May of 2024 to inform the treasurer that Goldfield Funding Partners LLC would need to file a notice to commence the tax deed process pursuant to MCA 15-18-111(1).[43] In summary, the Dismissal Parties argue that the Conversion Parties present no new evidence requiring relief, and having failed to appealed the Dismissal Order, are not entitled to relief under Civil Rule 60(b)(6).

### III. Analysis

Civil Rule 60(b) is applicable under Fed. R. Bankr. P. 9024. Civil Rule 60(b) allows a party to seek relief from a final judgment or order. The Rule outlines six grounds for relief, but at issue here are:

(1) mistake, inadvertence, surprise, or excusable neglect;

(3) Fraud (whether previously called intrinsic or extrinsic), misrepresentation, or

---

[38] ECF Nos. 174; 177; and 178, respectively. Debtor filed an additional reply at ECF No. 181, joined by the Goldfields Parties at ECF No. 182.

[39] ECF No. 174. UST argues that this Court's holding that "dismissal was the only possible outcome given the language of the Plan" would require this Court to set aside the Confirmation Order, which is impossible due to the deadline set by the Code in § 1144. ECF No. 174 at 4.

[40] ECF No. 181, 6.

[41] ECF No. 186, 0:17:30–0:17:50. In fact, Jefferson did not even filed a claim in this case.

[42] ECF No. 186, 0:17:30–0:17:50.

[43] ECF No. 187, 1:12:10–1:14:00; ECF No. 177.

8

misconduct by an opposing party;

(6) Any other reason that justifies relief.

Reconsideration is an extraordinary remedy "'to be used sparingly in the interests of finality and conservation of judicial resources.'" *Puckett v. Mack*, 2024 WL 5089260, at *2 (E.D. Cal. Dec. 12, 2024) (quoting *Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) and *Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008)).

As a threshold issue, the Conversion Parties' narrow focus the best-interest-of-creditors test in the Dismissal Order, evidences a fundamental misunderstanding of this Court's underlying decision dismissing the case. This case was dismissed because the Plan unambiguously required dismissal if Debtor failed to achieve the Effective Date. This case was not dismissed because the Conversion Parties failed to establish conversion is in the best interests of creditors. The entire discussion of the best interests of creditors in this Court's decision enjoys an important caveat DEQ and Jefferson conveniently ignore, "[e]ven if relief [(conversion)] were available as a remedy," and this Court explicitly concluded conversion was no longer a remedy pursuant to the language in the Plan.[44]

Following the Dismissal Hearing and in the Dismissal Order, this Court unequivocally found and concluded the Plan and Confirmation Order were binding on the parties and mandated dismissal.[45] If this was incorrect, the Conversion Parties' remedy was to vindicate their rights by appeal to and relief from an appellate court.[46] *See Kemp v. United States*, 596 U.S. 528, 538 (2022) (noting that motions alleging errors that could have been raised sooner should be denied). Civil "Rule 60(b) was not intended to afford a substitute for appeal." *Twentieth Century-Fix Film Corp. v. Dunnahoo*, 637 F2d 1338, 1342 (9th Cir. 1981) (quoting *Title v. United States of America*, 263 F.2d 28, 31 (9th Cir. 1959), *cert. denied*, 359 U.S. 989 (1959)).

A. Civil Rule 60(b)(1)

Civil Rule 60(b)(1) is generally concerned with a mistake of the party moving for relief. *See Bank of Am., N.A. v. Los Prados Comm. Assoc.*, 2021 WL 5984985, at *2 (9th Cir. Dec. 16, 2021) (finding that a party's knowledge of a proceeding, failure to respond, and delay in filing a 60(b) motion constituted 'deliberate actions' that did not justify relief); 12 Moore's Federal Practice – Civil § 60.41 (2025). However, legal and factual mistakes of the court are also subject to Civil Rule 60(b)(1). *See Kemp*; *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34–35 (2d. Cir. 2003). The motion must point to a specific error and is not an

---

[44] ECF No. 163, 9–10, 14.

[45] ECF Nos. 162; 163.

[46] The Dismissal Hearing and Order were entered more than 3 months before Jefferson filed its first pleading in the case. Jefferson neither moved for dismissal nor conversion and it objected to neither.

9

opportunity to create a new argument for the underlying motion or have the court rethink previously decided issues. *Bonilla v. California*, 2024 WL 3043531, at *2 (S.D. Cal. June 18, 2024) (compiling cases).

Without citing to any contrary authority, Jefferson and DEQ continue to gloss over the binding effect and finality of an order confirming a plan. *Lawrence Tractor Co. v. Gregory (In re Gregory)*, 705 F.2d 1118, 1123 (9th Cir. 1983); *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 42 (2020)("Only plan approval, we observed 'alters the status quo and fixes the rights and obligations of the parties'") (quoting *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015)). Jefferson contends this Court made factual mistakes when it concluded, "dismissal of this case, as opposed to conversion to Chapter 7, was in the best interests of creditors."[47] It expands on this argument concluding, "a sale is the only way creditors might get paid."[48] Jefferson conveniently ignores significant portions of this Court's prior ruling and, more importantly, the law cited throughout it.

Similarly, the DEQ argues that, in addition to factual errors, this Court's prior decision suffered from legal errors. Under its analysis, this Court was mistaken when it concluded that section 5.12 of the Plan was enforceable. It relies on a series of cases for general principles regarding § 1112(b),[49] while ignoring the critical issues in this case—the finality of confirmation, res judicata effect of confirmation, and a policy of finality in reorganization cases. Before addressing Jefferson and DEQ's specific arguments, revisiting basic principles is instructive.

The heart of the Chapter 11 process is creditor consent. Elizabeth Warren & Jay Westbrook, *The Law of Debtors and Creditors* 677 (6th ed. 2009). "A Chapter 11 petition is an invitation to a negotiation [between the debtor and the creditors]." *Id.* at 397. "The law and practice of Chapter 11 establishes a framework for negotiations." *In re Arnold*, 471 B.R. 578 (Bankr. C.D. Cal. 2012) (quoting Douglas Baird, *The Elements of Bankruptcy* 86 (4th ed. 2006). "[T]he provisions for plan confirmation are central to the Chapter 11 process." Warren, *Chapter 11: Reorganizing American Businesses* 134 (2008). "Confirmation is the final settlement of the rights of the parties." *Id.* DEQ and Debtor engaged in this process. The Plan that was confirmed

---

[47] ECF No. 167, 9.

[48] ECF No. 167, 10.

[49] ECF No. 179. *In re Delta AG Grp., LLC*, 596 B.R. 186, 190-91 (Bankr. W.D. La. 2019) (stating motion to dismiss or convert a Chapter 11 case "solely concern federal bankruptcy law"); *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 613 (BAP 9th Cir. 2014) (stating bankruptcy court has "independent obligation" under § 1112 "to determine which option," either conversion or dismissal, "is the better choice."); *4:20 Communs., Inc. v. The Paradigm Co.*, 336 F.3d 775, 778 (8th Cir. 2003) (parties may not expand the limited jurisdiction of the federal courts by waiver or consent.); *In re RNI Wind Down Corp*, 2007 Bankr. LEXIS 982, at *33 (Bankr. D. Del. 2007) (stating "the Court is not troubled that its ruling may render certain provisions of the Plan meaningless or superfluous. While inclusion of such provisions is to be avoided when possible, plans of reorganization (which are drafted by the parties) often contain provisions that have little or no legal effect").

10

reflects the agreement and bargain DEQ and Debtor negotiated. Jefferson chose to neither negotiate nor protect its interests.

Confirmation dramatically "alters the status quo and fixes the rights and obligations of the parties[,]" *Ritzen*, 589 U.S. at 42 (quoting *Bullard*). Once the requirements are met and a plan confirmed, the plan is essentially a new contract—sometimes characterized as a consent decree. *Hillis Motors, Inc. v. Haw Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993) ("A reorganization plan resembles a consent decree and therefore, should be construed as basically a contract"). "[O]nce the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself." *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992). At confirmation, the rights of DEQ, Jefferson, and Debtor were fixed and each was bound by the Plan.

To ensure the finality of the confirmation process, "[o]nce a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to res judicata effect." *Trulis*, 107 F.3d at 691. Res judicata "promotes fairness to parties who have negotiated and relied upon Chapter 11 plans and supports the strong policy of finality in the reorganization process." *Rosenstein,* 2019 Bankr. LEXIS 2998, at *18. The confirmed Plan in this case was a final judgment. *Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972 (9th Cir. 2005). A final order of a federal court may not be collaterally attacked. *Alakozai v. Citizens Equity First Credit Union (In re Alakozai)*, 499 B.R. 698, 704 (BAP 9th Cir. 2013). These principles are integral to the reorganization process and Chapter 11. Absent finality, Chapter 11 would be a perpetual negotiation and renegotiation between a reorganized debtor and its creditors. Despite these principles, DEQ and Jefferson insist this Court rewrite the Plan, and impose relief that was neither a feature of any iteration of the plans filed, nor the final confirmed plan.

1. **DEQ argues this Court's legal mistakes included reliance on a plan provision that was never operative (i.e., despite its finality, 5.12 in the Plan was not controlling)**

DEQ argues that this Court was mistaken when it concluded that 5.12 of the Plan was enforceable. Instead, it argues this Court was not bound to interpret the Plan as it was written, and instead should have disregarded the Plan in favor of § 1112(b) and converted the case to Chapter 7. According to DEQ, paragraph 5.12 of the Plan should be given no effect because it cannot override the bankruptcy court's authority to determine whether conversion or dismissal is in the best interests of creditors.[50] DEQ's argument cannot be reconciled with either the basic principles recited above or its conduct in the case.

Debtor and DEQ engaged in negotiations that resulted in a set of specific terms that reflect the "new contract" between the parties. When it has served its interest, DEQ has acted in a manner consistent with the Plan. It did not hesitate to enforce its rights in the bonds immediately following default, resulting in forfeiture. Despite that, it has also on no less than two occasions collaterally attacked the Confirmation Order and Plan, initially when it urged

---

[50] ECF No. 179, 2.

conversion and now, under the guise of mistake and Civil Rule 60(b). In this immediate effort, it has done so without a legal basis for doing so. DEQ has made no effort to reconcile its general statements regarding § 1112(b), with the effect of confirmation, res judicata or more broadly the Chapter 11 process.[51]

DEQ's arguments now are irreconcilable with the positions it took prior to confirmation. DEQ voted to accept the Plan, including provision 5.12, which explicitly provided that if there was a default the case would be dismissed, not converted. Indeed, DEQ's Plan support was essential to confirmation. It held the "keys in its hand."[52] If this Court indulged DEQ's conversion arguments, the negotiated agreement reflected in the Plan would be upset and deprived of the finality it is afforded under the law. DEQ's collateral attack on the Plan and Confirmation Order would be rewarded. This is contrary to the law.

This Court considered arguments about whether the Parties were bound by paragraph 5.12 of the Plan and ultimately enforced the Plan as it was written, consistent with confirmation and finality. DEQ's allegations of mistake ignore specific and applicable principles that are controlling when parties negotiate, confirm, and then default under a plan. Even if this Court had committed a legal error, the Plan is binding because the Conversion Parties had notice of the error and failed to object or timely appeal. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 273–75 (2010).

---

[51] DEQ relies on the following cases (and others) for general principles without any nuanced discussion of confirmation and its impact on conversion. *Supra*, n.49. Not a singular case relied on by DEQ involves a confirmed plan with a provision that seemingly dictates the exclusive remedy following default after confirmation.

[52] ECF No. 163, 5. Prior to confirmation, DEQ was exceptionally active in this case. DEQ was directly involved in numerous matters, including: Extension of the exclusivity period (ECF No. 37); Objection to the disclosure statements (ECF Nos. 55; 56; 67); a motion to modify stay (ECF No. 69); and a previous motion to dismiss (ECF No. 117). Additionally, the bonding issue loomed over the case and was a contributing factor in Debtor's default under the Plan. ECF Nos. 114 and 117. DEQ had ample opportunity to point out any issues with the paragraph 5.12 prior to confirmation. DEQ even cites to paragraph 5.12 in its joinder of UST's motion to dismiss:

> The Debtor's failure to remit to DEQ the $1,500,000 bond payment due by December 31, 2023, constitutes a material default under the Plan, i.e., a failure to achieve the Effective Date, and consequently the express terms of ¶ 5.12 of the Plan, call for Debtor's Chapter 11 to be dismissed immediately.

ECF No. 117, 2. This Court recognizes that DEQ still asked this Court to convert the case, but it takes a dim view of holding up paragraph 5.12 when it suits speedy resolution while simultaneously disavowing it when it stands in the way of DEQ's objectives.

12

**2. Jefferson alleges this Court's mistakes generally involve its failure to convert the case, its consideration of the effect of the Goldfields tax certificate, and its failure to conclude a sale is the only way creditors might get paid**

Jefferson contends this Court made no less than three mistakes. Each of the alleged mistakes hinges on a limited reading of this Court's prior decision. Jefferson seemingly ignores the majority of this Court's prior Decision and Order explaining its reasoning, and instead focuses extensively on five discrete paragraphs to the exclusion of the remaining 15 pages. This case was dismissed because the Plan unambiguously required dismissal if Debtor failed to achieve the Effective Date. It was not dismissed because the Conversion Parties failed to establish conversion is in the best interests of creditors. As a result, whether this Court made a mistake regarding the benefits of conversion, the effect of the tax certificate, or a sale in a Chapter 7 case is of little consequence because it provides no grounds for relief.

Despite having disregarded it in this Court's earlier Decision and Order, Jefferson is reminded:

> [i]f a creditor fails to timely object to a plan or appeal a confirmation order, 'it cannot later complain about a certain provision contained in a confirmed plan, even if such a provision is inconsistent with the Code.'

*Crown Vantage, Inc.*, 421 F.3d at 972 (quoting *Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172 (9th Cir. 2004)). This case was not dismissed because this Court made a mistake about the relative benefits of conversion over dismissal, the effect of the tax deed process, or the benefits of a Chapter 7 sales process; it was dismissed because the parties were subject to a final judgment, one that specifically provided that the case would be dismissed if the Effective Date was not achieved.

Equally important and fatal to the Conversion Parties' analysis is the assumption that following conversion Debtor's assets would automatically be Chapter 7 estate assets available to pay creditors. Confirmation in a Chapter 11 case automatically "vests all of the property of the estate in the debtor" unless otherwise provided for by the plan. § 1141(b). After confirmation "the debtor may go about its business without further supervision or approval . . . [a] debtor is usually without the protection of the bankruptcy court as well." *Hillis*, 997 F.2d at 589. Conversion postconfirmation does not automatically mean property of the Chapter 11 estate will be property of the Chapter 7 estate available to pay creditors.

The governing law in the Ninth Circuit is that the court must look to "the Plan's 'language, purposes, and context'" to determine whether vested assets are converted to the Chapter 7 estate. *Baroni v. Seror (In re Baroni)*, 36 F.4th 958, 972 (9th Cir. 2022) (quoting *Hillis*, 997 F.2d at 590. Here, there is little indicia in the Plan to suggest Debtor's vested assets would be included in the Chapter 7 estate. Indeed, in every iteration of the plan Debtor included dismissal as the singular consequence for failure to achieve the Effective Date. This weighs heavily against finding the plan's language, purpose, and context evince an intent that vested assets would be converted to the Chapter 7 estate in this case.

13

### B. Civil Rule 60(b)(3)

Civil Rule 60(b)(3) requires that the moving party "must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party from fully and fairly presenting the defense." *Casey v. Albertson's Inc*, 362 F.3d 1254, 1260 (9th Cir. 2004) (quoting *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 880 (9th Cir. 2000)). This must be proved by clear and convincing evidence. *Id.* This Court is not persuaded that Imeson's statements were either false or misrepresentations that weigh in favor of extraordinary relief.[53]

The Conversion Parties do not argue Imeson's testimony prevented them from making their case. Indeed, Jefferson has no basis to make such an argument because it did not file a pleading or otherwise take a position when the U.S. Trustee moved to dismiss the case. Jefferson's first foray into the case, excluding its ballot, occurred after this case was dismissed.[54] It is particularly bold for Jefferson to assert the positions it has taken here. Jefferson had the opportunity to oppose the motion to dismiss and actively participate in this case and it chose not to do so. For Jefferson to now argue that testimony on an issue it did not oppose, at a hearing it did not attend, prevented it from fully and fairly vindicating its rights is unprecedented. *See Lompa v. Price (In re Price)*, 871 F.2d 97, 99 (9th Cir. 1989) (finding that even where a debtor had committed fraud, a creditor still had an obligation "to take timely action to protect his claim"); *Bunch v. U.S.*, 680 F.2d 1271, 1283 (9th Cir. 1982) (finding that a party could not sustain a Civil Rule 60(b)(3) action where he had a "full and fair opportunity to present his case").[55]

Unlike Jefferson, DEQ appeared at the hearing and cross-examined Imeson at length. For example:

> Q: Okay. So, what is the source of funding that Montana Goldfields, Inc., allegedly pro---- provides to Montana Tunnels?
>
> A: From our – from our investors.
>
> Q: Okay. So, the – you're using other people's money through the shell parent corporation, Montana Goldfields, Inc., to fund necessary operations, is that your testimony?
>
> A: We have a capital plan, and my money is included in that capital plan. But yes, there

---

[53] ECF No. 181.

[54] *See* ECF Nos. 162; 163; and docket in general.

[55] Even if this Court were persuaded relief may be appropriate – and it is not – Jefferson's failure to oppose the underlying motion to dismiss precludes it from seeking relief now.

14

> are – we have outside investors that participate in that – in that plan.
>
> ***
>
> Q: As things stand now, if the case is dismissed, then title to the core mining property of Montana – of Montana Tunnels mining will be transferred to an insider of Goldfields end of August of this year; is that correct?
>
> A: With -- with – our agreement – as I stated, and we've stated previously, our agreement is that Goldfields Funding Partners is willing – for a sale, for financing purposes, is willing to, basically, repatriate the title of the property back to Montana Tunnels as part of that transaction and – and maintain its status as a secured creditor[56]

It is difficult for DEQ to argue Imeson's testimony amounted to fraud on this Court that precluded it from making its case. When questioned about the consistent losses that Debtor experienced, Mr. Imeson testified, "those losses are going to continue. If that's your question, those losses will continue until [Debtor] has a – is able to restart."[57] This Court is unconvinced that the testimony was fraudulent when Mr. Imeson informed this Court that continued losses were entirely possible. Irrespective of this testimony and Debtor's aspirations, ultimately dismissal was dictated by the Plan's plain language and Confirmation Order.

The Plan mandated dismissal. It was not dismissed because Imeson testified Debtor would strive to honor its obligations. Although post dismissal, this Court expressed an interest in whether Debtor was performing in the manner it had indicated it would, its post dismissal performance would not impact the outcome because dismissal was attributable to the Plan's plain language and finality accorded orders confirming plans, not Debtor's aspirations. If this Court were persuaded Imeson's testimony or conduct unfairly denied DEQ the opportunity to litigate its position, relief may be warranted. However, the record is devoid of clear and convincing evidence this occurred. Imeson was cross-examined by competent and experienced counsel. His testimony conceded further losses were possible. The Conversion Parties have failed to establish relief is warranted under Civil Rule 60(b)(3).

### C. Civil Rule 60(b)(6)

Civil Rule 60(b)(6) applies only if it is not based on any grounds provided for by another rule and "extraordinary circumstances" exist. *Bynoe v. Baca*, 966 F.3d 972, 979 (9th Cir. 2020). Extraordinary circumstances occur where there are "other compelling reasons" that prevented the movant from raising the motion during the case. *Martinez v. Smith*, 33 F.4tth 1254, 1262 (9th Cir. 2022) (quoting *Bynoe*, 966 F.3d at 983). In addition to the limited circumstances of Civil Rule 60(b), in general 60(b)(6) "should be 'used sparingly as an equitable remedy to prevent manifest injustice.'" *Martinez*, 33 F.4th at 1262 (quoting *Hall v. Haws*, 861 F.3d 977, 987 (9th Cir. 2017). Additionally, the manifest injustice standard is only concerned with "extraordinary

---

[56] ECF No. 183-1, 6.

[57] ECF No. 178-1, 10.

circumstances [that] prevented a party from taking timely action to prevent or correct an erroneous judgment." *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1103 (9th Cir. 2006) (quoting *United States v. Washington*, 394 F.3d 1152, 1158 (9th Cir. 2005)).

Civil Rule 60(b)(6) is a heightened catchall for purposes of remedying manifest injustice.[58] Immediately, the Conversion Parties argue for an equitable remedy for the issues they contend above: Imeson's representations and the tax deed.[59] As discussed, 60(b)(6) does not apply to issues that can be raised under other grounds. *Bynoe*, 966 F.3d at 979. Accordingly, this Court discounts those arguments. Having sought relief under Civil Rule 60(b)(1) and (3), this Court is skeptical (b)(6) is available. Instead, the Conversion Parties challenge the outcome, arguing that Debtor is without assets to pay creditors and that the Confirmation Order should be vacated because paragraph 5.11 "intended that [Jefferson] not retain its lien following confirmation" which allegedly violated fair and equitable treatment under § 1129(b)(1).[60]

### 1. Recasting the arguments under 60(b)(1) and (3) as (b)(6) is not persuasive

"Judgments are not often set aside under Rule 60(b)(6)." *Latshaw*, 452 F.3d at 1103. This remedy is only available "where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment . . . . [requiring the party] to demonstrate both injury and circumstances beyond his control that prevent him from proceeding with the action in a proper fashion." *Id.* At 1103 (citations omitted) (cleaned up) (quoting *United States v. Washington*, 394 F.3d at 1157) and *Comm. Dental Servs. v. Tani*, 282 F.3d 1164, 1168 (9th Cir. 2002)). Here, the Conversion Parties point to no "extraordinary circumstances" that warrant relief. Neither do they assert that they were prevent from proceeding in a proper fashion through appeal or other alternative remedy.

There is nothing extraordinary about the tax deed issue that weighs in favor of relief under Rule 60(b)(6). The tax deed issue has been looming since before the bankruptcy case commenced.[61] It was discussed at the Dismissal Hearing.[62] It was discussed in the Dismissal Order.[63] Neither of the Conversion Parties appealed, and Jefferson did not file an objection to the motion to dismiss or even attend the Dismissal Hearing. The tax deed issue simply does not provide a basis for relief under Civil Rule 60(b)(6). Instead, it reflects a separate statutory process under applicable nonbankruptcy law that affords counties like Jefferson the ability to

---

[58] *Supra*, Part III.

[59] ECF Nos. 167, 11–12; 179, 13–14.

[60] ECF Nos. 167, 11–13; 179, 13–14.

[61] ECF No. 180, 6.

[62] ECF No. 162.

[63] ECF No. 163, 9.

16

collect delinquent taxes. Jefferson has collected more than $5 million in past due taxes through the statutory process. Having elected the benefits of this process, it must embrace the consequences of that decision, even if it regrets the impact it may have on its metal mine reclamation taxes.

At the conclusion of the hearing, counsel for Jefferson asked, ". . . why we don't just give a trustee the chance to sell the property and pay the creditors? . . . Why can't we do that? Let's do it. If it doesn't work out, it doesn't."[64] This appeal to equity is unavailing. Jefferson never objected to the Plan nor its inclusion of the language providing for dismissal if the Effective Date was not achieved. As a result, there is nothing inequitable about concluding it's bound by the Plan and prior orders of this Court. Jefferson has not articulated a singular extraordinary circumstance that prevented it from taking timely action to prevent or correct an erroneous judgment at any stage of this case.

Conversely, DEQ negotiated the terms included in the Plan, including dismissal if Debtor failed to achieve the Effective Date. DEQ never objected to this provision in the Plan. DEQ acted in a manner consistent with Plan. It immediately enforced its interests in the bonds when permitted to do so. Despite having benefitted from certain plan provisions, including bond forfeiture, it cynically urges this Court to disregard other provisions in the Plan. This Court interpreted a Chapter 11 plan and dismissed a Chapter 11 case. DEQ did not appeal, despite having actively participated at every stage of the case. These are not extraordinary circumstances that justify relief under Civil Rule 60(b)(6). This Court declines the invitation to abandon the Code and the finality afforded orders confirming plans in favor of an "equitable" result that is wholly inequitable. Under DEQ's analysis, the provisions in the Plan that benefit it would be enforceable, while those it now dislikes would be arbitrarily disregarded.

### 2. Jefferson's construction of paragraph 5.11 seizes upon a scrivener's error in the Plan and construes it absurdly

"An interpretation which gives effects to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." *Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1209 (9th Cir. 2024) (quoting *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 420 (Cal. Ct. App. 2012). "Uncorroborated allegations and 'self-serving testimony' will not create a genuine issue of material fact. *Heko Servs., Inc. v. ChemTrack Alaska, Inc.*, 418 F.Supp.3d 656, 660 (W.D. Wash. 2019) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)). Jefferson's argument that the Confirmation Order should be vacated is entirely dependent on its construction of paragraph 5.11 of the Plan which states,

> Retention of Liens. The holders of Class I, II, III, and V Secured Claims shall retain their liens, if any, until their claim secured by said lien is satisfied in accordance with this Plan or if disputed, until [Debtor] escrows the disputed claim amount in accordance with Paragraph

---

[64] ECF No. 187, 1:21:00–1:21:30. This statement reflects the assumption that on conversion the Chapter 11 estate's assets will automatically be included in the chapter 7 estate. This assumption may be flawed.

8.04.[65]

Jefferson was designated as Class IV.[66] As a result, its omission in the provision above could be construed as eliminating its lien. However, a reading of the entire Plan reveals the inclusion of Class V rather than Class IV to be a scrivener's error.

A secured claim under the Plan consists of "an *Allowed Claim* secured by a lien, security interest or other charge against or interest in property in which MTMI has an interest, or which is subject to set-off under § 553 of the Bankruptcy Code. . . ."[67] An "Allowed Claim" includes "a claim . . . which is set out and not claimed as unliquidated, contingent or disputed in Schedules D, E, or F of [Debtor]'s bankruptcy schedules and as to which no proof of claim has been filed."[68] Jefferson County's claim is in Debtor's schedule D at 2.4 and 2.5, neither of which are contingent, unliquidated, or disputed.[69]

Similarly, the operative portions of the Plan clearly show that Jefferson was considered a secured claimant. Paragraph 5.11 includes Class V, which is composed of contingent claims for environmental claimants—none of which are secured.[70] Jefferson, meanwhile, is described as "Secured Claimant Jefferson County, Montana Treasurer, holds a junior lien on the property of [Debtor]."[71] The classification of Jefferson as secured is consistent with all other named classes in Paragraph 5.11.[72] A document should be read in consideration of the meaning of the entire document. *King v. Burwell*, 576 U.S. 473, 486 (2015) ("when deciding whether language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.' Our duty, after all, is 'to construe statutes, not isolated provisions'") (citations omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) and *Graham Cnty. Soil and Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)); Antonin Scalia and Brian Garner, *Reading Law: The Interpretation of Legal Texts*, 167 (2012) ("Whole-Text Cannon"). Reading the text as a whole, it is clear that Jefferson retained its lien and was a secured party. This Court explicitly recognized Jefferson as an impaired secured

---

[65] ECF No. 102, 10.

[66] ECF No. 102, ¶ 5.05.

[67] ECF No, 102, 3.

[68] ECF No. 102, 2.

[69] ECF No. 9, 13–14.

[70] ECF No. 102, ¶ 5.06.

[71] ECF No. 102, ¶ 5.05.

[72] ECF No. 102, ¶ 4.01–4.04, 5.02–5.05

creditor maintaining its lien in the Confirmation Order.[73] If this was unintended by Debtor, it should have appealed. But it did not. Therefore, the Confirmation Order is binding, and Jefferson is a secured creditor under the Plan. Accordingly, there are no grounds to revoke or void the Confirmation Order.

### C. Conclusion

Conversion Parties have failed to meet their burden. Beyond fundamentally misunderstanding the grounds of the Dismissal Order, they have presented little beyond old arguments that were previously considered. If the Conversion Parties disagreed with this Court's prior rulings, their remedy was filing a timely appeal. The reorganization process that produces plans that are confirmed is not subject "do-overs" or sequels when hindsight causes a party to second guess the benefits of the bargain it negotiated. Instead, the parties are bound by the agreements and compromises embodied in the confirmed plan. An Order will be entered separately denying the relief requested.

Dated May 28, 2025.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana

---

[73] ECF No. 105.